# WHEELING.

## MEYER *v.* MARSHALL.

Submitted June 6, 1890.—Decided June 21, 1890.

1. ACCOUNT—EVIDENCE—SETTLEMENT.

Where there is a controversy about the validity and effect of a settlement, and there is evidence tending to prove that it was made under mistake and coercion, it is not error for the court to refuse to exclude from the jury the question of whether or not such settlement is conclusive between the parties as to the matters included therein.

2. ACCOUNT—EVIDENCE.

A case in which it is held that the court erred in denying the motion of the defendant to exclude from the jury so much of the plaintiff's evidence as related to certain specified charges in the account sued on, but that it did not err in refusing to exclude all the plaintiff's evidence.

*W. W. Arnett* for plaintiff in error, cited :

5 W. Va. 50 ; 20 W. Va. 472, 477 ; 3 Call 5 ; Waterman Set-Off &c. 641, 644 ; 19 W. Va. 772 ; Taylor Landlord & Tenant (8th Ed.) 376 ; 24 W. Va. 815.

*Cranmer & White* and *B B Dovener* for defendant in error.

*R. White* cited 24 W. Va. 814.

SNYDER, PRESIDENT :

Action of *assumpsit* by Thomas Meyer against Walter Marshall in the Circuit Court of Ohio county. The declaration contains the common counts only, and demands the sum of nine hundred and seventy dollars and eighty cents. The itemized account filed with the declaration shows that the plaintiff's claim consists in part of certain articles of personal property sold to the defendant, and in part for work done and money paid for the defendant in driving and repairing the entry in a certain coal-mine. The case was tried by jury on the issue of *non assumpsit*, and there was a verdict and judgment for the plaintiff for three hundred and twenty dollars. This writ of error was obtained by the defendant.

After all the evidence for the plaintiff had been introduced, the defendant moved the court as follows : *First*, to strike out all the evidence of the plaintiff; *second*, to strike out the evidence of the plaintiff as to certain items embraced in the settlement; and, *third*, to strike out the evidence of the plaintiff relating to a number of items of the plaintiff's account specified in the motion, including all the charges for driving entry in the coal-bank—which several motions the court overruled, and the defendant excepted. It is insisted by the plaintiff in error that the action of the court in overruling said motions, and each of them, was erroneous.

All the plaintiff's evidence is certified in the record ; and it appears therefrom that the defendant was the owner of a tract of land near the town of Fulton, in Ohio county, and that the children of George W. Nichols owned another tract adjoining that of the defendant; that both of said tracts contained coal, and that an entry had been driven

for some distance into Nichols's land, in the direction of the land of the defendant, from which cross-entries had been driven, and the coal made accessible by said entries removed from said Nichols's land. The said colliery was known as the "Fulton Coal-Bank;" and, in order to reach the coal on the defendant's land from the mouth of said bank, it was necessary to extend the main entry, starting near Fulton, and running in a north-easterly direction for some distance, and then continue it in the same direction into the land of the defendant.

Before this main entry had been extended to the defendant's land, he and A. J. Clarke, as trustee for Nichols's children, on July 1, 1876, entered into a written contract whereby Clarke leased the said coal-bank and Nichols's land to the defendant for the term of ten years upon a specified rental or royalty. In said contract it is provided that in working said coal-bank the lessee, Marshall, may drive the main entry forward into the coal belonging to Nichols, and use said main entry for the purpose of bringing coal out of his (the defendant's) land, and that defendant is to protect said main entry by leaving sufficient pillars to support the roof, and to keep it in good working order and repair.

After making this lease the defendant took possession of the premises, and mined coal therefrom until April 6, 1881, at which date he entered into a written contract of lease with the plaintiff, Meyer, whereby the defendant, subject to all the conditions and provisions contained in the aforesaid contract with Clarke, trustee, leased to the plaintiff the right of mining and digging coal in the said property, leased by the defendant from Clarke as aforesaid, for the term of five years, upon a fixed royalty. The said contract provides that the said Meyer shall operate only such portion of said coal-bank as the said Marshall shall from time to time indicate, and in such manner as he (Marshall) may direct; "and the said Meyer agrees to build all chutes and tracks outside, and to pay one half of all expenses for all repairs that may at any time be needed at any place upon any part of the property used or enjoyed by him, excepting the main entry, also for one half of all ex-

penses of procuring and maintaining a due supply of air, and to keep the aforesaid premises in good order and repair, and to so mine and dig that there shall be no unnecessary waste or loss of coal."

At the time this lease was made to the plaintiff, the defendant had driven the main entry from the point where it terminated at the time the Clarke lease was made, in 1876, through the Nichols land, and beyond into his own land, to where the coal had been removed from his own land by an entry commencing near the Top mill, on the opposite side of the hill, and running in an opposite direction. These two entries were connected by a room so that a person could pass from the one to the other; and a short distance back from the place where said two entries terminated, and about the point where the Fulton entry crosses the line between the defendant's and Nichols's land, the defendant had commenced and driven for a short distance an entry at nearly a right angle to the Fulton entry, along the line between the lands of the defendant and the lands of Nichols, running in an easterly direction, so that, when continued, it would come out at what is known as "Stackyard Hollow." This last-mentioned entry was parallel to a number of similar entries which had been driven from the main entry, between it and the mouth, at Fulton, for the purpose of taking the coal out of Nichols's land; and all the coal had been taken out of said land made accessible by these cross-entries, and they had been abandoned.

This was, as near as it can be explained without a diagram, the situation and condition of this coal-bank and leased premises in April, 1881, the time when the aforesaid contract was made between the plaintiff and defendant.

The plaintiff then took possession of the premises leased to him, and he and the defendant continued to mine coal, the plaintiff taking coal from the Nichols land, and the defendant from his own adjoining land, both of them using the main entry coming out at Fulton for taking out their coal; and they each, also, used the Stackyard Hollow entry, running, as before stated, on the line between the prem-

ises operated by the plaintiff and defendant, respectively, the plaintiff opening rooms and removing the coal from the south side of this entry, and the defendant from his own land on the north side. As these parties continued their operations, they extended and finally drove this common entry through to its exit at Stackyard Hollow, in order to get.the coal on either side of it, and to procure air and drainage.

The evidence for the plaintiff tends to prove that he paid one half of the cost and expenses of driving the said Stackyard Hollow entry, and for draining and keeping the same in repair; that he was confined to his house with a broken leg for nineteen months, and during that time the greater part of said work was done, and he paid for the one half thereof, either by the direction or upon the orders of the defendant; that he knew said work was being done when he paid for the same, but afterwards he found that, by the contract of lease, this work should have been done or paid for by the defendant; and then he brought this action, in part, for the recovery of the expenses so mistakenly paid by him. On cross-examination the plaintiff himself testified that he and the defendant had two settlements—the first in September, 1882, and the second in February, 1884.

As the first settlement was before the origin of nearly all the items charged in the plaintiff's account, it is unnecessary to dwell upon it. The second settlement, however, occurred subsequent to the date of all the charges in the account sued on; but it appears that only a part of the items sued on—much less than one half—was embraced in said settlement. In respect to the character of this settlement, the plaintiff testified that it was forced upon him at a time when he was sick, and incapable of doing business; that he took no part in said settlement, but merely submitted to the acts done by the defendant, who made out the items on both sides, and struck a balance, and compelled the plaintiff, in his disabled condition and against his protest, to give his notes for the balance so ascertained by the defendant to be due from him, the plaintiff. It is proper to add here that, while such is the testimony of the plaintiff in regard to said settlement, there are other state-

ments and facts in his testimony which tend to a different conclusion as to the character of said settlement. But, taking the testimony for the plaintiff as a whole, we can not say, as a question of law, that the settlement was of such a character as to estop or preclude the plaintiff from assailing it. In all cases where there is a controversy as to whether or not a full settlement has been made by the parties, the question whether or not a settlement was in fact made is one for the jury, and not for the court. *Varner* v. *Core,* 20 W. Va. 472. It follows, therefore, that the court did not err in refusing to strike out the plaintiff's evidence relating to the items embraced in the alleged settlement; and it also follows, as a further and necessary consequence, that the court did not err in refusing to strike out all of the plaintiff's evidence.

The only remaining inquiry is : Did the court err in refusing to strike out the evidence of the plaintiff relating to the charges in the plaintiff's account for driving entry *etc* ? The solution of this question involves the true interpretation of the contract of lease of April 6; 1881, between the plaintiff and defendant. In ascertaining the meaning of this contract, we must consider the instrument itself, and the situation and circumstances of the parties and the subject-matter at the time the contract was made. In other words, we must put ourselves in the position which the parties then occupied, so that we may fully understand the language of the contract as understood by them, and apply it to the subject and purpose of the written instrument. At that time the defendant, under his contract with Clarke, had driven the main entry entirely through and beyond the Nichols land, and was mining coal both from his own and the Nichols land. For this purpose, he had not only driven said main entry, but had started a cross-entry from it, in the direction of Stackyard Hollow, on or near the line between him and Nichols. On the north side of this entry was the land and coal of the defendant, and on the south side was the land and coal of Nichols.

This being the situation and surroundings of the parties, they provided in their contract that each party was to pay one half of all expenses for repairs needed on any part of

the property used by them, excepting the main entry. Now, the important question is, what did they mean by the words "the main entry?" The only entry completed at that time was the entry from Fulton to its terminus beyond the Nichols land. The Stackyard Hollow entry had at that time been driven but a short distance; and it is a different entry from the other, because it is not a continuance of that entry, but a distinct and separate entry, driven at right angles, and away from said old entry. It is plain that the entry running back from the mouth at Fulton is a main entry. It was the entry from which all the other cross-entries had been driven, and out of which all the coal mined in that bank had been taken. It was the entry from which the Stackyard Hollow entry had been started, and over and through which the parties would have to take out all the coal they expected to mine in the Stackyard Hollow entry. This was certainly a main entry; and if the Stackyard Hollow entry was also a main entry, as claimed by the plaintiff, then there were two main entries. The contract, however, refers to only one main entry. Its language is, "excepting the main entry," not the main entries. Taking all the facts and circumstances surrounding the parties, it seems to me clear that, when they used the phrase "the main entry" in the contract, they intended the entry running back from Fulton, and that they did not mean the cross-entry running in the direction of Stackyard Hollow, which is entirely a different entry, and one that had, at the time the contract was made, been driven but a short distance.

The Fulton entry being then, "the main entry," which the contract exempts the plaintiff from aiding to keep in repair, and he having bound himself to pay one half of the expenses for all other work and repairs needed on any part of the property used or enjoyed by him, it was proper that he should pay the one half of the expenses necessarily or properly incurred in opening and keeping in repair the Stackyard Hollow entry. Consequently the court should have sustained the motion of the defendant to exclude the evidence of the plaintiff relating to the driving and repairing of said Stackyard Hollow entry, and it erred in refusing to do so.

For this error the judgment of the Circuit Court must be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

REVERSED.  REMANDED.